## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 16 2018, 7:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Dorothy Ferguson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of J.I., Jr., Minor Child,

J.I., Father,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 16, 2018

Court of Appeals Case No.
18A-JT-339

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

Trial Court Cause No.
48C02-1701-JT-1

**Brown, Judge.**

[1] J.I. ("Father") appeals the involuntary termination of his parental rights with respect to J.I., Jr. ("Child"). Father raises two issues which we consolidate and restate as whether the trial court erred in terminating his parental rights. We affirm.

## Facts and Procedural History

[2] On November 18, 2015, the Indiana Department of Child Services ("DCS") filed a verified petition alleging that Child, born on October 20, 2015, was a child in need of services ("CHINS") and that he was residing in relative placement. The petition also alleged:

> a. Mother and Father struggle with an opiate addiction. Mother consumed opiates, [b]uprenorphine, and [h]ydrocodone while she was pregnant with [Child]. Subsequent to [Child's] birth Mother consumed THC and methadone as evidenced by an instant drug screen collected on November 13, 2015.
>
> b. [Child's] meconium screen was positive for opiates, [b]uprenorphine and THC.
>
> c. [Child] displayed signs of withdraw [sic] at the time of birth.
>
> d. Domestic violence issues are present between Mother and Father.

*Id*. at 141.

[3] On December 15, 2015, the court issued a pre-trial conference order stating that Father admitted to waiving his right to factfinding, but did not admit to any domestic violence; that it was in the best interest of Child to be removed from the home environment; and that DCS was responsible for the care and

placement of Child. On January 12, 2016, the court issued an order on dispositional hearing which required Father to contact the family case manager every week; notify the family case manager of any arrest or criminal charges; maintain suitable, safe, and stable housing; secure and maintain a legal and stable source of income; not use or consume any illegal controlled substances and prohibit the possession, use, or consumption of any illegal controlled substances in the home or in the presence of Child; become engaged in a home-based counseling program referred by the family case manager; complete a substance abuse assessment, successfully complete all treatment recommendations; submit to random drug screens; complete a psychological evaluation; and attend all scheduled visitations with Child.

[4] On July 6, 2016, the court issued an order on periodic case review which found that Father had not complied with the case plan; he had not enhanced his ability to fulfill his parental obligation; and he had not cooperated with DCS. The court also found that Father had been closed out of home-based casework due to non-compliance in December 2015; he had been closed out of Fatherhood Engagement in January 2016 due to non-compliance; he had infrequent visitation with Child; and that Father's current whereabouts were unknown.

[5] On January 4, 2017, the court issued an order approving a permanency plan which stated that Child had been in relative care for approximately thirteen months and was progressing well; Father had not complied with Child's case plan; Father had been in jail on February 1, 2016, and incarcerated for the

periods of August 22 through October 12, 2016, and November 23 through December 12, 2016; Father came to the DCS office on December 12, 2016, upon his release from jail, told the family case manager that he wanted to begin services, was currently homeless, and was without a phone; and that the family case manager told Father to contact him when he finds a place to stay so that he could obtain Father's contact information to create referrals.

[6] On January 9, 2017, DCS filed a verified petition for involuntary termination of the parent-child relationship alleging there was a reasonable probability that the conditions that resulted in Child's removal would not be remedied; there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child; termination of the parent-child relationship was in the best interests of Child; and that there was a satisfactory plan for the care and treatment of Child, which was adoption.

[7] On May 23, 2017, a court-appointed special advocate report was submitted to the court and stated in relevant part that as of May 16, 2017, Father was non-compliant with substance abuse treatment and with obtaining a psychological evaluation and that he was currently incarcerated in the Madison County jail.

[8] On June 28, 2017, the CHINS court issued an order on periodic case review stating that Mother had signed a consent for "her aunt and uncle" to adopt Child and that Father had been incarcerated since March 19, 2017, and did not consent to the adoption. *Id.* at 95.

[9] On December 5, 2017, the court held a factfinding hearing at which Katie Wade, the Father Engagement home-based care manager assigned to Father in the "winter of 2015-2016," testified:

> [C]ommunication was a barrier for a lot of it . . . but when [Father] was present for visitations, the visitations did go well . . . foster placement did have to provide everything during the visits . . . to care for [Child]. . . . [Father] did . . . miss visits. A lot of it was . . . again due to that lack of communication. I was going from Anderson to Elwood to pick him up and so kind of tracking him down and finding him was one of our issues a lot of the times one of the barriers we had.

Transcript Volume I at 18. She further testified that the services were closed out in "late winter of [2016]" due to non-compliance, meaning Father had "stopped communicating and [she] was unable to locate him," and there was no documentation of any of the goals being met. *Id.* at 19.

[10] Kristen Lowe, the home-based caseworker assigned to work with Father, Mother, and Child in November of 2015, testified she was contracted to "[help] them find Medicaid," "get signed up for food stamps," "find more stability," and "help them get into their own place find jobs . . . parenting skills . . . those types of skills." *Id.* at 23. She testified that she was not able to complete the intake process because Father cancelled due to Mother being incarcerated; that she contacted Father and Mother a week later, but Mother was still incarcerated "so we decided to wait three weeks," or the "typical . . . time-frame" under the

Children's Bureau policy; and that on December 18, 2015, she closed out services due to non-compliance. *Id.* at 25.

[11] Theresa Rushing, Mother's aunt, testified that Child had been in her care since birth, and that she and Child had bonded well. She stated that she was well-bonded with Child, and that she believed he was well-bonded with her. She indicated that Father reached out to her "probably two or three" times about seeing Child. *Id.* at 35. She testified that his last visit to see Child was on December 28, 2015, and it lasted two hours.

[12] Robert Rushing, Mother's uncle, testified that since DCS placed Child in his care he and Child had bonded. On cross-examination, Robert testified that, in regard to whether he would be willing to "do a [g]uardianship as opposed to adoption," he would be willing to do "whatever is in the best interest for [Child] to make sure he is loved and taken care of." *Id.* at 30. He indicated that, "[i]n the event that [Father] would ever get clean and get his life strai[gh]tened out and could prove that he was clean and straight and [that] [Child's] safety was in his best interest . . . [he] would obtain [sic] letting [Father] see [him] and be a part of his life." *Id.* at 31. Robert also testified that he had reason to doubt that Father was clean even though he was incarcerated because he had "heard people can get stuff inside there." *Id.* at 32.

[13] FCM Allbee testified that DCS removed Child from Mother and Father's care due to concerns of domestic violence and concerns that they were not meeting Child's medical needs by not taking him to follow-up doctor appointments.

The court admitted, as Exhibit A, orders relating to the CHINS case and took judicial notice of the case, and FCM Allbee answered, "they both admitted," when asked if Mother and Father admitted to the allegations of the CHINS petition. *Id.* at 45. The court admitted into evidence Father's drug screens as Exhibit B and his criminal records as Exhibits D, E, F, G, and H.[1]

[14] FCM Allbee further testified that Father did not communicate with her, that she had only seven interactions "face to face" with him in two years, that to her knowledge he had not had stable housing for the last two years, and that he had reached out to her in December 2016 upon release from jail and stated that he wanted to begin services. *Id.* at 51. When asked what the major barriers were to Father being reunified with Child, she testified:

> I would say his lack of communication. Lack of . . . legal address. He has been incarcerated several times. He hasn't maintained any sort of contact when his (sic) out of jail. . . . [W]hen he does have the random drug screens, he has tested

---

[1] Exhibit B contains a screen from Forensic Fluids Laboratories that indicates Father tested positive for THC and oxycodone on October 22, 2015; for oxycodone and benzodiazepines on November 19, 2015; for amphetamine, methamphetamine, and THC on April 14, 2015; and for amphetamine, methamphetamine, THC, and opiates on July 6, 2016. Exhibit D relates to Father's pending criminal charge filed on August 25, 2017, under cause number 48C05-1708-F6-2191 for unlawful possession of a syringe, a level 6 felony; Exhibit F relates to Father's convictions under 48C05-1703-F6-763 for residential entry, a level 6 felony, and theft, a class A misdemeanor, which he committed on October 28, 2016, and pled guilty on October 2, 2017; Exhibit G relates to Father's criminal charges filed on January 4, 2017, under cause number 48C05-1701-F6-24 for possession of methamphetamine, a level 6 felony, and unlawful possession of a syringe, a level 6 felony; and Exhibit H relates to Father's convictions under cause number 29D06-1611-CM-8417 for two counts of theft, class A misdemeanors, and for knowingly or intentionally operating a motor vehicle without ever receiving a license, a class C misdemeanor, which he committed on November 4, 2016, and pled guilty on June 7, 2017.

positive for illegal substances. . . .  [H]e has not complied with any sort of his . . . recommendations from the [c]ourt.

*Id*. at 55.

[15] FCM Allbee further testified that Father had been aware that DCS wanted to terminate his parental rights since January 2017 and that he had not done anything with DCS, while incarcerated or while not incarcerated, to establish services or visitation with Child.  She indicated that she did not think that Father's compliance with services "allowed for any beneficial involvement," that continuation of the parent-child relationship would pose a threat to Child's well-being, and that it would be in the best interest of Child that Father's parental rights be terminated because Child is in a "safe and stable home where they are able to provide for him."  *Id*. at 57-58.

[16] Moriah Fairer ("CASA Fairer"), Child's court-appointed special advocate since January 2016, testified that, "[Child] is doing well.  I visit him every month . . . and every month he is just a bundle of joy . . . growing up and . . . now he is talking a lot more . . . he is doing very well and very bonded with the family."  *Id*. at 68.  When asked if Child looked well-bonded with his relative placement, she answered affirmatively and stated, "[H]e sits on their laps loves on them . . . he has always called them mommy and daddy . . . and he is like five feet or ten feet away from me . . . every time I come he wants to sit on their lap . . . he talks with them any time they are in conversation with me he wants to direct their attention to him so he is very bonded with him."  *Id*. at 68.  CASA Fairer

testified that Father had not contacted her at all. Regarding whether the reasons Child was removed would ever be remedied, she testified:

> I do not believe that it wouldn't be remedied . . . just because just within the year of [2017] there has been . . . a few occasions of arrest for the same thing . . . possession of a syringe possession . . . I believe it's methamphetamine . . . different things like that and . . . breaking and entering so . . . I would be I am not convinced that it wouldn't happen.

*Id*. at 69-70.

[17] CASA Fairer testified that she believed the continuation of a parent-child relationship would pose a threat to the well-being of Child because she did not think it was safe or was in his benefit to "see [Father] in a way . . . you know being drug exposed and . . . abusing substances," that she believed Father was given ample opportunity to visit or see Child, and that the termination of Father's parental rights was in the best interest of Child. *Id*. at 70-71.

[18] Father testified:

> [W]hen [Child] was first removed at the time, we came home from the hospital . . . [Mother] obviously you know he was drug exposed . . . stayed at my [g]randmother's at the point in time . . . my Dad and [Mother] got into a . . . yelling match. She slapped him. He pushed her. I got in the middle of it . . . the cops got called they made [Mother] at that point in time leave with [Child] . . . we separated at that time. . . . I called CPS and let them know how irate I was about the whole ordeal where I couldn't keep [Child]. Anyway, a couple of weeks later I get a phone call saying that [Mother] has missed the first two [d]octor's appointments and they went to the [home of Mother's

father] and at that point in time they was taking [Child] from the . . . residency in their care and they didn't even give me a chance at all. They for no reason they had no reason not one chance to take [Child] . . . they put him in the care of [Theresa and Robert Rushing].

*Id*. at 76. After being asked if he knew Theresa and Robert Rushing, he answered affirmatively and stated:

I was okay with that, but I wasn't okay with that because it's my Son . . . I had no domestic abuse against [Mother] . . . I had no involvement of why [Mother] didn't take [Child] to the first two [d]octor appointments. I had transportation. I had the you know family to back me up on this.

*Id*. at 76-77.

[19] Father testified that he had been incarcerated "fourteen . . . to fifteen months" out of the last two years, that he tried to gain admittance into an in-patient program while he was out of jail, and that while waiting for a couple of weeks, he "just went back around the same people and the places and things and started using again." *Id*. at 79-80. He testified that he was currently incarcerated, that he was likely going to "get drug [c]ourt or the vivitrol shot program" when he returned to court on the fourteenth of that month, and that he "started a parenting class . . . on [his] own behalf." *Id*. at 81. When asked what was different from the other times he had said he "hit rock bottom" and was going to "get things back together," Father testified that this time was different because he "got [his] head out of [his] . . . rear end and got [his] . . .

life focused" and that he just wanted "this chance," and that, if after six months "[he] ain't proved [himself]," the court could take Child from him. *Id.* at 82-85.

[20] On January 11, 2018, the court issued an order terminating the parent-child relationship between Child and Father, citing Father's drug use, criminal history and recent charges, the multiple opportunities Father had been given to participate in services offered by DCS, and Father's lack of interest in and contact with Child.

## *Discussion*

[21] The issue is whether the trial court erred in terminating Father's rights. Father argues DCS failed to show with clear and convincing evidence that the conditions resulting in Child's removal would not be remedied or that the continuation of the parent-child relationship posed a threat to Child. He maintains that the basis for Child's removal was not due to his own actions. He also asserts that, at the termination hearing, he had been sober for almost four months, the longest that he had been in years, and maintains that, because of this, there is a reasonable probability that he would have remedied his substance abuse issue.

[22] The State responds by arguing that Father did not challenge any of the court's findings of fact and these findings support the court's conclusions. It maintains that Father fails to accept any responsibility for DCS's involvement, has not successfully completed any of the recommended services, has not seen Child since December 28, 2015, and that Father's failure to participate in services and

attend visitation with Child demonstrates that Father did not want to change for Child. It further maintains that Father's continued drug use and criminal behavior also indicate there is a reasonable probability that Father would not remedy the conditions that led to Child's removal.

[23] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[24] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is a "heightened burden of proof" reflecting termination's 'serious social consequences.'" *In re*

*E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.* 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

A. *Remedy of Conditions*

[25] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of Child outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[26] In determining whether the conditions that resulted in Child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration

evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id*. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id*.

[27] A court may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A parent's habitual patterns of conduct must be evaluated to determine the probability of future negative behaviors. *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1234 (Ind. 2013). Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. *Id*. at 1235-1236.

[28] To the extent Father does not challenge the court's findings, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007)

(failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[29] The record reveals that Father struggled with substance abuse at the time of Child's removal, has not completed the reunification services recommended by DCS, has not complied with required random drug screens and has tested positive for illegal substances on multiple occasions. The record also reveals that Father had been in and out of incarceration throughout the CHINS proceedings, was incarcerated at the time of the fact-finding hearing, had been incarcerated for fourteen or fifteen months over the last two years, and had not maintained contact with the family case manager during the interim. The record also reveals Child was born on October 20, 2015, and that Father pled guilty to crimes committed on October 28, 2016, and November 4, 2016. Child has been placed with Robert and Theresa Rushing since November 16, 2015, and Father's last visit was for two hours on December 28, 2015. We cannot say that the trial court erred in its conclusion that a reasonable probability exists that the conditions leading to Child's removal and continued placement outside the home will not be remedied.

B. *Best Interests*

[30] In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent

to those of the children. *Id*. Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification, and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interest inquiry. . . ." *Id*. at 648. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re. A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[31] The court found that Child had resided with Robert and Theresa Rushing since November 16, 2015. Child has been observed as being very bonded with his caregivers. Further, evidence presented at the termination hearing supports the court's findings. Both FCM Allbee and CASA Fairer testified that it was in the best interest of Child that the parent-child relationship of Child and Father be terminated. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the determination that termination is in the best interest of Child is supported by clear and convincing evidence.

## *Conclusion*

[32] We conclude that the trial court did not err in terminating the parental rights of Father.

[33] For the foregoing reasons, we affirm.

[34] Affirmed.

Bailey, J., and Crone, J., concur.